[Cite as *Akron v. Pouliot*, 2011-Ohio-2504.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

CITY OF AKRON

    Appellee

    v.

SHAWN POULIOT and
RIVERSIDE RESTAURANT, LLC

    Appellants

C.A. No.    25160


APPEAL FROM JUDGMENT
ENTERED IN THE
AKRON MUNICIPAL COURT
COUNTY OF SUMMIT, OHIO
CASE Nos.    09 CRB 08233
                  09 CRB 08234

DECISION AND JOURNAL ENTRY

Dated: May 25, 2011

---

CARR, Judge.

**{¶1}** Appellants, Shawn Pouliot ("Pouliot") and Riverside Restaurant, LLC ("Riverside"), appeal their convictions out of the Akron Municipal Court. This Court affirms.

I.

**{¶2}** The parties stipulated that Pouliot was the principal of the Riverside corporation. Complaints were filed against Pouliot and Riverside, alleging two violations by each of Akron City Code ("ACC") 132.16 regarding sound amplification devices, minor misdemeanors. The trial court dismissed one count against each defendant upon the city's motion.

**{¶3}** The cases proceeded to trial before the bench. The city and defendants filed post-trial briefs. Pouliot and Riverside challenged the constitutionality of the ordinance. On August 27, 2009, the trial court issued a judgment entry in which it found the ordinance to be constitutional, found both Pouliot and Riverside guilty of their respective alleged violations, and scheduled the matter for sentencing at a later date. The defendants appealed. This Court

dismissed their appeal by journal entry filed November 10, 2009, for lack of a final, appealable order. Although the trial court file jacket in both cases contained various notations indicative of convictions and sentences, we noted that there was no time-stamp indicating that the judgments had been filed with the clerk of courts as required by Crim.R. 32(C); see, also *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330.

{¶4} On December 2, 2009, the trial court issued a judgment entry of conviction and sentence for both defendants. Pouliot and Riverside filed a timely appeal, raising two assignments of error for review. This Court rearranges the assignments of error to facilitate review.

II.

### ASSIGNMENT OF ERROR II

"AKRON'S SOUND ORDINANCE WAS UNCONSTITUTIONALLY APPLIED TO APPELLANTS[.]"

{¶5} Pouliot and Riverside argue that the Akron sound ordinance is unconstitutionally vague and overbroad. This Court disagrees.

{¶6} ACC 132.16 states, in relevant part: "No person shall generate or permit to be generated unreasonable noise or loud sound which is likely to cause inconvenience or annoyance to persons of ordinary sensibilities by means of a radio, phonograph, television, tape player, loudspeaker or any other sound amplifying device or by any horn, drum, piano or other musical or percussion instrument."

{¶7} The Ohio Supreme Court has long held that there is a presumption that all legislative enactments are constitutional and that courts shall apply every presumption and relevant rule of construction to uphold a challenged statute or ordinance, if at all possible. *State v. Dorso* (1983), 4 Ohio St.3d 60, 61.

Vagueness

**{¶8}** "To withstand a claim of vagueness, a criminal statute must define a criminal offense with sufficient clarity for ordinary people to understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, at ¶238.

**{¶9}** The *Dorso* court considered whether a noise regulation ordinance similar to the provision at issue in this case was unconstitutionally vague. While recognizing that noise ordinances will be "inherently imperfect," the high court held that an ordinance which proscribes noises reasonably anticipated to offend the reasonable person, rather than the hypersensitive person, "provides parties with constitutionally sufficient 'fair warning' of what conduct is criminally punishable." *Dorso*, 4 Ohio St.3d at 64. This Court recently considered the constitutionality of R.C. 2917.11(A)(2), another statute regulating, in part, "unreasonable noise." *State v. Carrick*, 9th Dist. No. 09CA0077, 2010-Ohio-6451. In reliance on *Dorso*, and noting its application by other courts, we recognized: "In short, Ohio courts have concluded that an ordinance that regulates the volume of noise-as distinguished from the content of speech-is not unconstitutionally vague if it incorporates a reasonable person standard." *Carrick* at ¶11.

**{¶10}** ACC 132.16 does not regulate content of speech. Rather, it merely proscribes the generation of "unreasonable" sounds which will likely disturb "persons of ordinary sensibilities," i.e., "the reasonable person." We conclude, therefore, that the objective standard articulated in ACC 132.16 provides fair warning of the conduct proscribed so that the ordinance is not unconstitutionally vague.

Overbreadth

{¶11} The overbreadth doctrine applies to "facial" challenges to the constitutionality of legislative enactments. *Members of the City Council of Los Angeles v. Taxpayers for Vincent* (1984), 466 U.S. 789; see, also *State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals* (1992), 63 Ohio St.3d 354, 357 ("The overbreadth doctrine represents an exception to the usual rules applicable to standing. It permits a party to challenge a statute on its face when others not presently before the court may be affected by the statute's application.") Although Pouliot and Riverside frame their assignment of error as a challenge to the constitutionality of the ordinance merely as applied to them, we will nevertheless address their argument that the ordinance is constitutionally overbroad.

{¶12} The overbreadth doctrine is applicable only within the narrow context of First Amendment rights and serves to invalidate a legislative enactment only where the statute or ordinance "prohibits constitutionally protected conduct." *Cleveland v. Trzebuckowski* (1999), 85 Ohio St.3d 524, 528, quoting *Grayned v. Rockford* (1972), 408 U.S. 104, 114. Pouliot and Riverside argue that the ordinance infringes on their right to free speech.

{¶13} The chief complaint by nearby residents against Pouliot and his business stemmed from the playing of loud live music which the residents claimed disturbed their peace. ACC 132.16 expressly includes in its proscription of "unreasonable noise or loud sound which is likely to cause inconvenience or annoyance" the emanations of "any horn, drum, piano or other musical or percussion instrument." It is well established that music is a form of communication or expression included within the purview First Amendment protections. *Ward v. Rock Against Racism* (1989), 491 U.S. 781, 790. Nevertheless, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are

justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication of the information.'" Id., quoting *Clark v. Community for Creative Non-Violence* (1984), 468 U.S. 288, 293.

{¶14} First, ACC 132.16 does not purport to regulate the content of protected speech. Rather, it regulates the use of certain equipment, specifically, radios, phonographs, televisions, tape players, loudspeakers, sound amplifying devices, and musical/percussion instruments. The regulation of mere audio equipment evidences content-neutral regulation. *State v. Cornwell*, 149 Ohio App.3d 212, 2002-Ohio-5178, at ¶36.

{¶15} Second, the ordinance is narrowly tailored to serve a significant government interest. R.C. 715.49(A) recognizes a municipality's significant interest in the preservation of peace by allowing for the regulation of express matters such as "noise and disturbance." Moreover, ACC 132.16 is narrowly tailored, not to proscribe all noise, but only "unreasonable" noise or "loud" sounds, and then only those which are likely to inconvenience or annoy the reasonable person, and not the hypersensitive.

{¶16} Third, the ordinance leaves open ample alternative channels for communication of the information. A legislative enactment is not overbroad only because there exists "some imaginable alternative that might be less burdensome on speech." *United States v. Albertini* (1985), 472 U.S. 675, 689, citing *Clark*, 468 U.S. at 299. ACC 132.16 does not proscribe the generation of all noises and sounds. There is no proscription against noises or sounds, even loud ones, if they are unlikely to inconvenience or annoy persons of ordinary sensibilities. Pouliot and Riverside were not prohibited from offering entertainment by way of live bands which played inside the facility or at a lower volume which would not inconvenience or annoy the

reasonable person who wished to have a conversation on his porch, enjoy fresh air in a home without air-conditioning, or retire to bed for the night.

{¶17} ACC 132.16 does not purport to regulate the content of speech, is narrowly tailored to serve a significant and legitimate government interest, and leaves open ample alternative channels for communication of the information. Accordingly, this Court concludes that the ordinance is not overbroad so as to render it constitutionally invalid.

{¶18} For the reasons articulated above, ACC 132.16 is neither vague nor overbroad. Accordingly, Pouliot's and Riverside's argument that the ordinance is unconstitutional must fail. The second assignment of error is overruled.

### ASSIGNMENT OF ERROR I

"THE CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]"

{¶19} Pouliot and Riverside argue that their convictions were against the manifest weight of the evidence. This Court disagrees.

> "In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, paragraph one of the syllabus.

This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction. Id. at 340.

{¶20} Both Pouliot and Riverside were convicted of violating the proscription against sound amplifying devices as set forth in ACC 132.16 and enunciated above. The violations were alleged to have occurred from May 1, 2009, through June 27, 2009.

{¶21} At trial, Captain Sylvia Trundle of the Akron Police Department ("APD") testified that she became familiar with Pouliot and Riverside in 2008 after receiving complaints from citizens in the area regarding loud music emanating from the restaurant premises. She attended a community meeting in October 2008, along with another police officer, the city prosecutor, a local councilman, Pouliot, and various residents. The captain testified that the purpose of the meeting was to try to resolve the noise issue and that it seemed likely that that could be accomplished. Pouliot repositioned the restaurant's sound stage in an effort to direct the music away from the affected residential areas, but complaints continued. Captain Trundle testified that, notwithstanding a subsequent letter from Pouliot indicating that he would cease the presentation of live music, Riverside continued to host live bands at its outdoor stage.

{¶22} Six area residents testified regarding the noise generated by Riverside and the effect it has had on them. Although the complaints identify the period from May 1, 2009, through June 27, 2009, as the time relevant to the alleged violations, the residents testified that the inconvenience and annoyance started the prior spring.

{¶23} Jamie Kidder testified that she, her husband, and two very young children live in a nearby neighborhood affected by loud, live music emanating from Riverside. She testified that the establishment began hosting live bands in the spring of 2008 and that the music was so loud that it caused the windows in her home to vibrate and reduced her to tears of frustration on several occasions. She asserted that she is a person of ordinary sensibilities.

{¶24} Ms. Kidder testified that she called Riverside but the establishment refused to reduce the volume. She testified that she called the police, her councilman, and the city prosecutor's office. She testified that she organized a community meeting in the fall of 2008, inviting affected citizens, the police, the city prosecutor, her councilman, and Pouliot, in an effort

to reach some resolution and determine whether there was a need or interest in pursuing prosecution. She testified that a decision was made to see whether the problem was resolved when the live music season resumed in the spring of 2009.

{¶25} Ms. Kidder conceded that Pouliot moved his sound stage and that those efforts helped. She further conceded that, by May 2009, Riverside only presented live, outdoor music twice a week instead of six times a week, and only until 11:00 p.m. She testified, however, that she must still close her windows and run a fan to drown out the noise in her home. Ms. Kidder testified that she continues to feel "violated," as she has no choice but to hear Riverside's loud music in her house. She testified that she called the police department in early June 2009, to complain but no one from the department spoke with her regarding her complaint. Ms. Kidder testified that she helped her neighbor, Robert Potter, organize a second community meeting later in June to address the issue.

{¶26} Robert Potter testified that he has lived in his home for thirty-one years and has never had any problems with any other businesses in the area, has never complained about noises from the nearby expressway or railroad tracks, and has never before talked with his councilman or the city prosecutor about any problems. He testified that he contacted Riverside regarding loud music but his concerns "went nowhere." He testified that he began calling the police who advised him to contact his councilman. He testified that his councilman advised him to contact the police.

{¶27} Mr. Potter testified that from May 1, 2009, through June 27, 2009, live bands have played at Riverside every Thursday and Saturday evening from as early as 6:30 p.m. until 11:00 p.m. He testified that he lives approximately 500 feet from the restaurant and that the

music disturbs him. He testified that his home does not have air conditioning but he must nevertheless sometimes close his windows to escape the sounds of loud music.

{¶28} Mr. Potter described his efforts to resolve the noise issue, including his participation in the fall 2008 community meeting and his organization of the spring 2009 meeting. He testified that he was encouraged by a letter purportedly drafted by Pouliot in June 2009, asserting that Riverside would discontinue its live music. He testified that the music has not, however, ceased and it continues to disturb and annoy him. Mr. Potter asserted that he is a person of ordinary sensibilities.

{¶29} Theresa Musch testified that she has been disturbed by the loud music from Riverside since the summer of 2008. She testified that the loud music prevents her from sitting on her porch in the evenings because its volume is so disturbing. She testified that she can hear the music inside her home even when her windows are closed and her air conditioning is running. She asserted that she can even hear it over the sound of trains which run on nearby tracks behind her home. She characterized the music as "an annoyance" which prevents her from carrying on a conversation while sitting outside.

{¶30} Ms. Musch testified that she has called the police to complain about the loud noise but the police have never come to her house. She testified that she brought her concerns to her councilman numerous times, signed a complaint regarding the loud music at Riverside at the city prosecutor's office, and complained to persons at the restaurant to no avail. She remembered calling the police some time in May 2009, but she could not remember the exact date. Ms. Musch testified that she attended the spring 2009 community meeting out of concern for the noise. She testified that she can now sleep through the music because she takes a sleep aid before bed.

{¶31} Sharon Kimmy testified that during the relevant time, she has been disturbed by loud music emanating from Riverside every Thursday and Saturday night, as well as occasionally on Wednesdays. She testified that she has to turn up the volume on her television to drown out the sound of the music in her home. She testified that she attended both the fall 2008 and spring 2009 community meetings to address her concerns. She testified that she has called the police to complain prior to May 1, 2009, but not during the time relevant to the complaint because the police have not followed up on her complaints.

{¶32} John Merold testified that the loud music from Riverside makes it impossible for him and his wife to enjoy their enclosed porch and deck. He conceded that the music is not quite as loud in 2009 as it was in 2008 but that the situation is still "not good." He testified that he recently spent $5000 to insulate his home and that that has helped deaden the noise. Although he admitted that he would have insulated his home whether or not Riverside played loud music, he also testified that the sound-deadening insulation was necessary because his wife's physical limitations necessitate her sleeping on the enclosed porch.

{¶33} Mr. Merold testified that he complained about the loud music at the community meetings. He asserted that he never called the police because "[Pouliot] has the police in his hip pocket."

{¶34} Evelyn Carlson testified that she is "very hard of hearing," yet she can still hear the hard rock music from Riverside. She described it as loud music with "a lot of bass, lot of drum." She testified that she shuts her doors and windows and turns up the volume on her television to try to drown out the noise. Ms. Carlson testified that she has called both the restaurant and the police to complain. She testified that the police have never stopped by her home after she has complained. As to the effect of the noise, she testified that "it frustrates me

so bad because I can't do nothing. *** I have a hard time going to sleep afterwards because I'm still upset and frustrated."

**{¶35}** Ms. Carlson testified that she called the police numerous times during the time relevant to the complaint. She testified that she has also called her councilman and the city prosecutor's office and that she attended the spring 2009 community meeting. She described the on-going situation as "very aggravating."

**{¶36}** Sergeant Vince Yurick of the APD testified that he was aware of the numerous noise complaints implicating Pouliot and Riverside. He testified that his supervisors directed him to ensure that any responding officers note their observations. He testified that, after a 6:30 p.m. complaint, he went to Riverside at approximately 7:00 p.m. before his shift ended, but he did not hear any music because the live band was only just starting to set up the equipment. He noted that one band member was beginning to tune his electric guitar at the time.

**{¶37}** Sergeant Yurick testified that he was at Riverside on only one other occasion for a shift party with fellow officers. He testified that between May 1 and June 27, 2009, twenty officers from the APD reported that they were taking their shift lunches at Riverside. The sergeant testified that none of those officers worked during his noon to 8:00 p.m. shift.

**{¶38}** Sergeant Yurick testified that Captain Trundle directed him to inform his officers to issue a citation to Pouliot and Riverside if they had probable cause to believe that a violation of the noise ordinance was occurring. He testified that he so instructed his officers.

**{¶39}** Pouliot and Riverside presented two witnesses in their defense.

**{¶40}** Tamela Green testified that she was disturbed by loud, live music generated by bands at Riverside in 2008. She testified that she called the police at least a dozen times that summer to complain about the noise. She testified that she called her councilman three or four

times without any response, and that she attended the fall 2008 community meeting. Ms. Green testified, however, that since Riverside moved its sound stage, she does not hear any music at all anymore, even with her new hearing aids. She testified that she likes patronizing businesses that play live music. Ms. Green testified that she wants Riverside to resume its live band concerts, although she admitted that she would again complain if she could hear that music in her house.

{¶41} Finally, Officer Brian Cresswell of the APD testified that he was dispatched on several occasions regarding noise complaints regarding Riverside. He testified that on May 21, 2009, he went to Riverside and seven other locations in nearby residential neighborhoods to perform sound checks. He determined that Riverside's music was audible in only two of the seven locations but not to the level of a violation of the noise ordinance. He testified that additional noise complaints were reported later that same evening around 10:30 p.m. but that he was not dispatched until 11:11 p.m. He found nothing to warrant a citation at that time.

{¶42} Officer Cresswell testified that there were two noise complaints on May 23, 2009, but he found no evidence to support a citation after investigating the first complaint. The officer testified that, on June 4, 2009, he determined that music from Riverside was "barely audible" at a location 600 feet away. He testified that on two unidentified occasions, however, he told Pouliot to turn down the volume of the music at Riverside.

{¶43} Officer Cresswell testified that he is frustrated with this situation, particularly Mr. Potter's repeated complaints. He testified that he investigates various loud noise complaints two to three times every night, and more on weekends. The officer admitted the loud music complaints are low priority calls.

{¶44} This Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge only because the trier of fact chose to believe certain witness' testimony over the testimony of others. *State v. Crowe*, 9th Dist. No. 04CA0098-M, 2005-Ohio-4082, at ¶22.

{¶45} A review of the record indicates that this is not the exceptional case, where the evidence weighs heavily in favor of Pouliot and Riverside. A thorough review of the record compels this Court to find no indication that the trial court lost its way and committed a manifest miscarriage of justice in convicting both defendants of violations of the city noise ordinance.

{¶46} The weight of the evidence supports the conclusion that Pouliot and Riverside generated or permitted to be generated unreasonable noise or loud sound which was likely to, and in fact did, cause inconvenience or annoyance to persons of ordinary sensibilities by means of musical and percussion instruments. The parties stipulated that Pouliot was the principal agent of Riverside. There is no dispute that, during the relevant time period, Riverside presented live band performances at an outdoor stage at its establishment. The evidence established that the performances included electric guitars and drums. Six residents from nearby residential areas testified regarding the disturbing effect of the music on their lives. Ms. Musch and Mr. Merold testified that they cannot enjoy evenings on their porches or decks when Riverside hosts a band because of the disturbing volume of the music. Ms. Kidder, Ms. Kimmy, Ms. Carlson, and Mr. Potter all testified that they are compelled to close their windows during naturally warm spring and summer evenings, in some cases without the benefit of air conditioning, to try to drown out the aggravating noise. Several witnesses testified that merely closing windows and doors was not enough to abate the frequent and hours-long annoyance. They testified that additionally they were forced to turn up the volume on their television sets or run fans to muffle the noise. Ms. Musch was able to finally sleep through the music only with the help of a sleep aid. Even Ms.

Green, who testified for the defense, complained about the volume of the music before the repositioning of the sound stage cured the problem for her. Although there was evidence that the police were unable to confirm disturbing levels of noise emanating from Riverside, many witnesses testified that the police never came to their residences to investigate their repeated complaints. Officer Cresswell admitted that loud noise complaints are a low priority for the police and that he is frustrated with both the situation and one of the complainants. Although he noted that the music was not audible at several locations during several sound checks, he testified that music was still barely audible even from 600 feet away from Riverside. Based on a review of the evidence, this Court concludes that Pouliot's and Riverside's convictions are not against the manifest weight of the evidence. Accordingly, the first assignment of error is overruled.

III.

{¶47} Pouliot's and Riverside's assignments of error are overruled. The judgment of the Akron Municipal Court is affirmed.

Judgment affirmed.

—————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Akron Municipal Court, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

_____
DONNA J. CARR
FOR THE COURT

DICKINSON, P. J.
BELFANCE, J.
CONCUR

APPEARANCES:

DONALD J. MALARCIK, Attorney at Law, for Appellants.

CHERI CUNNINGHAM, Director of Law, and DOUGLAS J. POWLEY, Chief City Prosecutor, for Appellee.