[Cite as *Woodmere v. Workman*, 2022-Ohio-71.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| VILLAGE OF WOODMERE, | : | |
| Plaintiff-Appellee, | : | No. 110449 |
| v. | : | |
| JOSEPH M. WORKMAN, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND VACATED
**RELEASED AND JOURNALIZED:** January 13, 2022

Criminal Appeal from the Bedford Municipal Court
Case No. 19 CRB 02290

### *Appearances:*

Lou D. Stolarsky, City of Woodmere Prosecuting Attorney,
*for appellee.*

Bolek, Besser, Glesius, L.L.C., Cathleen M. Bolek, and
Matthew D. Besser, *for appellant.*

SEAN C. GALLAGHER, A.J.:

{¶ 1} Joseph Workman appeals his convictions for two minor misdemeanor offenses, disorderly conduct in violation of R.C. 2917.11(A) and "Playing Of Radios, Boom Boxes, Tape Cassettes, Disc Players Or Any Other Sound Devices Prohibited" in violation of Woodmere Codified Ordinances ("W.C.O.")

509.09.  For the following reasons, we reverse the decision of the trial court and vacate the convictions.

{¶ 2}   Woodmere's police department is located across the street from Eton Shopping Center, a shopping complex that contains a Starbucks establishment.  At six o'clock on a December morning in 2019, Officer Sean Lemiec, a part-time officer for Woodmere, responded to a solicitation complaint from the coffee shop.  Officer Lemiec drove to the scene, at which time he heard music coming from the location.  Upon arriving, Officer Lemiec approached Workman, who was standing with an electric guitar attached to an amplifier that was inside his backpack.  As Officer Lemiec approached, Workman was between the public sidewalk and the parking lot adjacent to the Starbucks, on a concrete pathway connecting the public sidewalk to the crosswalk leading across the parking lot.

{¶ 3}   After an initial greeting, Officer Lemiec told Workman that he was on private property and that he would have to move along.  Workman disagreed and stated he was standing on a public sidewalk.  The two briefly discussed the difference between the concrete path connecting the crosswalk to the public sidewalk and the sidewalk itself.  As they discussed the difference, Workman moved to the public sidewalk, one step away.  Since Workman was standing on the public sidewalk and no longer on what Officer Lemiec considered private property, Officer Lemiec told Workman to move along because "you can't solicit in Woodmere."  Workman responded that he had not been soliciting.  At that point, the conversation was

relatively benign, with both Officer Lemiec and Workman simply discussing the matter in conversational and respectful tones.

{¶ 4} After obtaining Officer Lemiec's name and badge number, Workman asked to speak with a supervisor, who had coincidentally appeared off camera, or was already present, because Officer Lemiec responded by saying, "he's here." That supervisor was Sergeant Christopher Colon, a full-time officer for the Woodmere Police Department. Sgt. Colon testified to hearing Officer Lemiec's discussion with Workman from across the street and he came to assist Officer Lemiec after it appeared that he was having difficulty. Sgt. Colon took over the conversation upon his announced arrival. Sgt. Colon advised Workman that the officers were responding to a noise violation, although the police report noted that the call received was for solicitation, not a noise violation. Sgt. Colon admitted at trial he had not received the call, nor was he aware of the nature of the response requested.

{¶ 5} In response to Sgt. Colon's assertion about the potential noise violation, Workman asked about the decibel limits for the noise violation — seeking clarification on whether he can play a guitar at a certain level or not at all based on Sgt. Colon's assertion of the noise ordinances. Woodmere's noise ordinances are dependent on noise that exceeds a certain decibel level without regard to the time of day. *See* W.C.O. Chapter 519. The only time limitations in those noise ordinances appear to impact the use of lawn equipment. *See id.* Without responding to the inquiry directly, Sgt. Colon told Workman that the failure to comply with a police officer is an arrestable offense and that Workman had been ordered to not play the

guitar.  Workman then questioned Sgt. Colon's claim, stating that Woodmere does not have a noise ordinance, to which Sgt. Colon reiterated that if Workman played the guitar again, he would be arrested.

{¶ 6}  At that point, Workman crouched down and began to put the guitar into his backpack that was being used as a guitar bag.  He informed Sgt. Colon of that fact.  As the guitar was being packed away, Workman told the officers that he intended to bring a legal action for their conduct that violated his rights.  The conversation quickly degraded with Workman calling Sgt. Colon a "dummy," "piece of shit," and an "asshole" for what he perceived as his heavy-handed response, and Sgt. Colon urging Workman, in so many words, to "keep it up."  Sgt. Colon then informed Workman that if he kept "cussing," he would be arrested — further prodding Workman to assert his First Amendment right to speak freely.

{¶ 7}  As Workman finished securing the guitar back into his bag and collected his five-gallon bucket and other belongings, Sgt. Colon told Workman that he was not going to do anything.  To that, Workman responded: "Yeah, because you can't because the First Amendment protects me you fucking s [inaudible]."  One of the officers (it is not entirely clear who) asked, "you fucking what?"  Workman continued: "First Amendment.  The First Amendment, dude.  You ever hear that one?"  At trial, Sgt. Colon stated his belief that Workman was about to use a racially divisive term to describe his Hispanic heritage — claiming that Workman started to make an "sp" sound before cutting himself off.  Officer Lemiec was not asked and did not offer his opinion on the matter.  The audio is unclear, although a "s" sound

can be heard, Workman never finished his thought — leaving any conclusions to the speculative determination of the listener.

{¶ 8} Nevertheless, Workman stood from his crouched position after packing the guitar away and began to turn away from the officers in an apparent attempt to leave. It was then that Sgt. Colon ordered Workman to put down his belongings. Workman stopped, turned, and asked "why?" Sgt. Colon responded by telling Workman "you're going to jail" as he moved in and was grabbing Workman. Sgt. Colon then pulled Workman off the sidewalk and threw him facedown to the frozen ground. At no point before grabbing Workman did Sgt. Colon announce the impending arrest or offer Workman an opportunity to surrender.

{¶ 9} As Workman was lying prostrate with his hands behind his back, Sgt. Colon told Workman, who appeared compliant in the video (although, his arms were out of the camera view), "don't fucking move." Workman again asked the reason for which he was being arrested. Sgt. Colon responded: "it's called the asshole charge." Only later did Sgt. Colon clarify that Workman was being arrested for disorderly conduct, a minor misdemeanor that is not itself an arrestable offense. *State v. Matthews*, 1st Dist. Hamilton No. C-140663, 2015-Ohio-5075, ¶ 9 (disorderly conduct is not an arrestable offense unless the conduct is alleged to violate R.C. 2917.11(E)(3), providing that disorderly conduct is a fourth-degree misdemeanor if the person persists in committing disorderly conduct after reasonable requests to cease). For that matter, the alleged noise violation was not an arrestable offense either. The only offense allegedly committed before Workman was taken into

custody that was not a minor misdemeanor was the charge of obstructing official business under R.C. 2921.31(A), impeding a public official in the performance of an official duty, a second-degree misdemeanor. The resisting-arrest charge could arise only after Workman was placed under arrest and, therefore, could not be the basis for the arrest itself.

{¶ 10} Importantly, the encounter was brief; approximately three minutes transpired between Officer Lemiec's arrival and Workman's arrest. In addition, Workman's conduct demonstrated his willingness to comply with the officers' direction notwithstanding his vocal, and at times crass, disapproval of the police response. *Compare Wilson v. Jean*, 661 Fed.Appx. 234, 236 (3d Cir.2016) (the police officers' conduct in taking a protester to the ground to initiate an arrest, after he failed to comply with an order to disperse amidst a chaotic scene in which projectiles were being hurled at the officers, did not violate the person's rights).

{¶ 11} Workman was charged, as amended before trial, with "Playing of Radios, Boom Boxes, Tape Cassettes, Disc Players or Any Other Sound Devices" under W.C.O. 509.09, a minor misdemeanor; disorderly conduct under R.C. 2917.11(A), a minor misdemeanor; obstructing official business under R.C. 2921.31 (A), a second-degree misdemeanor; and resisting arrest under R.C. 2921.33(A) a second-degree misdemeanor. It appears that the latter two charges were predicated upon Workman's alleged failure to comply with a lawful order from a police officer and Sgt. Colon's comment during Workman's arrest to "stop resisting." The trial court, at the conclusion of a bench trial, found Workman guilty of the disorderly

conduct and "Playing Of Radios, Boom Boxes, Tape Cassettes, Disc Players Or Any Other Sound Devices," charges, but not guilty of the more serious, second-degree misdemeanor charges. In this appeal, Workman challenges both minor misdemeanor convictions.

{¶ 12} R.C. 2917.11(A) provides in pertinent part, that "[n]o person shall recklessly cause inconvenience, annoyance, or alarm to another by" either "making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person" or by "[i]nsulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response." R.C. 2917.11(A)(2)-(3). According to the Ohio Supreme Court, however, a

> person may not be punished under R. C. 2917.11(A)(2) for "recklessly caus[ing] inconvenience, annoyance, or alarm to another," by making an "offensively coarse utterance" or "communicating unwarranted and grossly abusive language to any person," unless the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace.

*State v. Hoffman*, 57 Ohio St.2d 129, 387 N.E.2d 239 (1979), paragraph one of the syllabus, citing *Cincinnati v. Karlan*, 39 Ohio St.2d 107, 314 N.E.2d 162 (1974). This is colloquially known as the "fighting words" exception.

{¶ 13} Woodmere concedes that Workman's arrest for disorderly conduct was entirely based on speech, implicating the First Amendment of the U.S. Constitution, and that the conviction can only stand if Workman's speech constituted "fighting words." According to Woodmere, Workman's verbal abuse

directed toward Sgt. Colon constituted "fighting words" that are not forms of protected speech. The trial court agreed with Woodmere, citing *Cleveland v. Smith*, 8th Dist. Cuyahoga No. 62560, 1993 Ohio App. LEXIS 5183 (Oct. 28, 1993); *Hoffman*; *State v. Hampton*, 66 Ohio App.3d 30, 583 N.E.2d 400 (1st Dist.1990), and *State v. Wood*, 112 Ohio App.3d 621, 679 N.E.2d 735 (11th Dist.1996), in support of the conviction. Although those cases generally stand for the proposition that "fighting words" are not protected speech if the "words by their very utterance are intended to inflict injury or provoke a reasonable person to an immediate retaliatory breach of the peace," we cannot review the decades-old authority in isolation. We understand the trial court's reliance on these cases in rendering a decision, particularly the *Smith* case, in which the panel concluded that a "police officer, although trained to preserve the peace, is also human, and under great stress of abuse may forget his official duty and retaliate in the face of such provocation." *Smith* at 11 (defendant convicted for disorderly conduct for using expletives telling a liquor control officer he had no right to search a cash register). *Smith*, however, may not have been in line with Supreme Court precedent when released, as will be discussed in further detail. Although we would expect a trial court in our district to follow binding precedent as the trial court did here, we are likewise duty bound to examine our precedent in light of other authority. It is time for this court to revisit *Smith* en banc to consider its continuing validity based on the following black-letter law.

{¶ 14} "It is a well-established that 'absent a more particularized and compelling reason for its actions, [a] State may not, consistently with the First and Fourteenth Amendments, make the simple public display * * * of [a] four-letter expletive a criminal offense.'" *Sandul v. Larion*, 119 F.3d 1250, 1254 (6th Cir.1997), quoting *Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). We, therefore, must start from the proposition that the use of crass language alone cannot justify a criminal conviction. The "fighting words" exception to the First Amendment first arose in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

{¶ 15} In *Chaplinsky*, the Supreme Court concluded that a New Hampshire statute, which declared it a crime to address any person lawfully in a public place with any offensive, derisive, or annoying words that had a tendency to cause acts of violence by the person to whom the remark was addressed, was constitutionally sound. *Chaplinsky* at 573-574. The defendant, after being beaten by a mob for preaching tenets of the Jehovah's Witness religion, called one of the arresting officers "a God damned racketeer" and "a damned Fascist" in response to his impending arrest. *Id.* at 569. For that, the defendant was convicted for using the offensive, derisive, or annoying words. In support of the conviction, the Supreme Court remarked, that "it is well understood that the right of free speech is not absolute at all times and under all circumstances." *Id.* at 571, citing, in pertinent part, *Schenck v. United States,* 249 U.S. 47, 48, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (the defendants had circulated flyers urging others to refuse to submit to the draft

into military service and were prosecuted for sedition).[1]  According to Justice Murphy, the restriction on Chaplinsky's speech was warranted because "[i]t has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.* at 572.  *Chaplinsky* formed the basis of Ohio's application of that First Amendment principle as adopted in *Karlan*, 39 Ohio St.2d at 110, 314 N.E.2d 162.

{¶ 16} Although *Chaplinsky* has been approvingly cited over the years, "the Supreme Court of the United States has not upheld a conviction on fighting words grounds since it decided *Chaplinsky*."  Eric T. Kasper, *No Essential Reason To Restrict The Freedom Of Speech: Why It Is Time To Knock Out Chaplinsky v. New Hampshire and The Fighting Words Doctrine*, 53 Tex.Tech L.Rev. 613, 614 (2021), citing Erwin Chemerinsky & Howard Gillman*, Free Speech On Campus* 92 (2017). Since 1941, the "fighting words" exception to the First Amendment has narrowed.

---

[1] *Schenck* established one of the most oft-repeated, but misunderstood, defenses of state censorship: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." *Schenck*, 249 U.S. 47 at 52, 39 S.Ct. 247, 63 L.Ed. 470.  Although the phrase is repeated in terms of the limits on free speech, often overlooked is the fact that it was uttered in support of censorship, criminalizing an individual who was protesting the military draft during World War I.  As Justice Holmes stated, "in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their constitutional rights." *Id.* at 52. Thus, it was established, that although permissible under the bounds of the First Amendment, speech could be censored during times of national emergency.  As modern notion of free speech has developed, it is apparent that "the overriding objective at all times should be to equip the first amendment to do maximum service in those historical periods when intolerance of unorthodox ideas is most prevalent and when governments are most able and most likely to stifle dissent systematically."  Vincent Blasi, *The Pathological Perspective and the First Amendment*, 85 Colum.L.Rev. 449, 449-450 (1985).

{¶ 17} In *R.A.V. v. St. Paul*, 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), for example, a case involving the prosecution of teenagers for placing and burning a cross in the yard of a black family, the Supreme Court noted that the "exclusion of 'fighting words' from the scope of the First Amendment simply means that, for purposes of that Amendment, the unprotected features of the words are, despite their verbal character, essentially a 'nonspeech' element of communication." In other words, the First Amendment protects against viewpoint discrimination, and that analysis must apply equally to "fighting words" as any other speech. "Even with fighting words, '[the] government may not regulate use based on hostility—or favoritism—towards the underlying message expressed.'"

{¶ 18} In light of this limitation, it has been concluded that "[t]he fighting words exception is very limited because it is inconsistent with the general principle of free speech recognized in our First Amendment jurisprudence." *Sandul*, 119 F.3d at 1255 (6th Cir.1997), citing *Texas v. Johnson*, 491 U.S. 397, 408-409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), and *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). The fear is not that the most crass and boorish of the population is free to spew invectives to arouse anger in others, but that the government will use the tenuous grasp of the "fighting words" exception to punish the content of the speech against those with whom the government disagrees. In *State v. Thompson*, 95 Ohio St.3d 264, 2002-Ohio-2124, 767 N.E.2d 251, for example, the state attempted to justify a version of R.C. 2907.07(B), that at the time provided, that "no person shall solicit a person of the same sex to engage in sexual

activity with the offender, when the offender knows such solicitation is offensive to the other person, or is reckless in that regard." *Id.* at ¶ 5. According to the *Thompson* Court, the statutory section, under the "fighting words" exception as placed in context through *R.A.V.,* cannot restrict the content of speech. *Id.* at ¶ 16. Proscribing "fighting words" of a specific character constitutes impermissible content-based limitations on one's constitutional freedom to speak freely. *Id.* Although the legislative purpose of the classification was to prevent violent responses to certain categories of solicitations, the nonspeech element of the "fighting words" exception, the overbroad means of accomplishing that demonstrated the notion of the "'realistic possibility that official suppression of ideas is afoot.'" *Id.* at ¶ 17, quoting *R.A.V.* at 390.

{¶ 19} In this case, Woodmere arrested, charged, and had Workman convicted for the minor misdemeanor, disorderly conduct violation entirely based on Workman's speech. At no time during the three-minute encounter did Workman threaten physical harm or continue engaging in the conduct to which the police officers were responding — whether that be the solicitation allegation or Workman's playing of the guitar at the early morning hours. In fact, Workman demonstrated his willingness to comply with the officers' demands throughout the encounter, thereby divorcing his actions from his speech.

{¶ 20} Upon being informed that he was arguably standing on private property, Workman promptly moved to the public sidewalk. When told solicitation was not allowed in Woodmere, he informed Officer Lemiec that he was not engaging

in solicitation. Roughly two-and-a-half minutes into the brief encounter, Workman began putting his guitar away upon being informed that Sgt. Colon intended to arrest him for failing to obey a lawful order if Workman played the guitar again. It was only after Workman collected his belongings, stood up, and turned to walk away, that Sgt. Colon arrested Workman. Sgt. Colon informed Workman he was going to jail as he grabbed him and threw him to the ground. Thus, the only basis for the arrest at that point was Workman's assertion of his First Amendment right to protest against the police officers' demands.

{¶ 21} "The freedom of individuals verbally to oppose or to challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Houston v. Hill*, 482 U.S. 451, 461-463, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). The First Amendment of the federal Constitution "protects a significant amount of verbal criticism and challenge directed at police officers." *Id.* at 461. Unless the speech is "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest[,]" the speech is protected under the First Amendment. *Id.*, quoting *Terminiello*, 337 U.S. at 4, 69 S.Ct. 894, 93 L.Ed. 1131. As the Supreme Court has repeatedly concluded, laws have been invalidated when they "provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them." *Id.*

{¶ 22} Woodmere's use of R.C. 2917.11(A) to arrest and prosecute Workman for unpalatable speech is the type of prosecution the Supreme Court warns against;

for "it would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *Hill* at 465, quoting *United States v. Reese*, 92 U.S. 214, 221, 23 L.Ed. 563 (1876). This overbroad use of vague statutes creates a chilling effect, threatening those who speak out with having to defend themselves in legal actions for their words. Woodmere asked the municipal court to do just that, permit the police officers the latitude to apply a broadly worded statute solely relying on the court to decide whether the net cast was sufficiently narrow as to permit the conviction for Workman's speech. As forewarned in *Hill*, "[t]he present type of ordinance tends to be invoked only where there is no other valid basis for arresting an objectionable or suspicious person." *Id.*

{¶ 23} Workman's speech was vulgar, uncouth, and demeaning to the officers, but his actions demonstrated an intent to comply with their order to cease playing the guitar and to remove himself from the public space, and Woodmere has not claimed that Workman's language produced a clear and present danger of a serious substantive evil. The issue became one of the spoken words. Workman's verbal protestations can best be described as a begrudging acceptance of the officers' authority and direction. Although the officers testified that Starbucks customers noticed the scene unfolding, Workman's speech alone cannot sustain a violation of R.C. 2917.11(A), especially when his actions demonstrated a willingness to submit to the officers' authority. *Garcia v. New Hope*, 984 F.3d 655, 669 (8th Cir.2021) (raising the middle finger to police officers is constitutionally protected expression

of speech), citing *Cruise-Gulyas v. Minard*, 918 F.3d 494, 497 (6th Cir.2019) ("Any reasonable officer would know that a citizen who raises [his] middle finger engages in speech protected by the First Amendment."). It has been "clearly established" under the First Amendment "that words alone cannot support probable cause for disorderly conduct—including profanity regarding police officers." *Alston v. Swarbrick*, 954 F.3d 1312, 1319 (11th Cir.2020), citing *Davis v. Williams*, 451 F.3d 759, 766 (11th Cir.2006), and *Gold v. Miami*, 121 F.3d 1442, 1446 (11th Cir.1997). As it stands, even under the "fighting words" exception to the First Amendment, there exists a "constitutional requirement that, in the face of verbal challenges to police action, officers and municipalities must respond with restraint." *Hill*, 482 U.S. at 471, 107 S.Ct. 2502, 96 L.Ed.2d 398.

{¶ 24} Had Workman's action not indicated any intent to comply with the officers' demand or clearly crossed into ethnic intimidation as statutorily defined, we may well have reached another conclusion since, at that point, the nonspeech element of the communication could form the basis of the disorderly conduct violation. *Columbus v. Fabich*, 2020-Ohio-7011, 166 N.E.3d 101, ¶ 25 (10th Dist.) (ethnic intimidation conviction with the predicate offense of disorderly conduct based on the use of ethnic slurs was deemed constitutional); *State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 18 (string citing cases holding that consideration of the accompanying conduct is necessary to determine whether profane utterances constitute fighting words); *State v. Morris*, 2d Dist. Montgomery No. 24810, 2012-Ohio-3287, ¶ 14 (the defendant screamed a number of vulgarities

at police officers attempting to assist the defendant for four to five minutes before the arrest, and it was noted that the defendant threatened one of the officers by screaming "fuck you, bitch" within six inches of the officer's face); *see also Abraham v. Nagle*, 116 F.3d 11, 14 (1st Cir.1997) (distinguishing a person's right to speak freely from their interference with a police officer's attempt to arrest a third party); *Colten v. Kentucky*, 407 U.S. 104, 109, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) (the First Amendment does not protect a person from interfering with a traffic stop). As it stands, the violation of R.C. 2917.11(A) was entirely based on Workman's verbal criticism and, at times, expletive-filled challenge to the police officers' authority over his speech. That conviction cannot be sustained.

{¶ 25} With this in mind, our decision today should not be read to condone any or all verbal assaults leveled against law enforcement officers. Law enforcement officers are tasked with, at times, challenging demands. As the law stands, however, crass speech can rarely, if ever, sustain a criminal conviction unless coupled with some permissible restriction on the nonspeech element of the conduct. *R.A.V.*, 505 U.S. at 386, 112 S.Ct. 2538, 120 L.Ed.2d 305. On this point, the law in this district appears to be outdated, or at best, overly simplified — creating confusion for the lower court's application of the law. In *Smith*, 8th Dist. Cuyahoga NO. 62560, 1993 Ohio App. LEXIS 5183, at 11, for example, the defendant was arrested for a minor misdemeanor, disorderly conduct violation for using profane language protesting a liquor control agent's search of the tavern's cash register, looking for evidence of after-hours sales. The panel concluded that the defendant's profane comments

directed at a law enforcement officer constituted fighting words because "[a] police officer, although trained to preserve the peace, is also human, and under great stress of abuse may forget his official duty and retaliate in the face of such provocation." *Id.* This rationale stands in contrast to the notion of restraint imposed upon local municipalities and state actors as espoused in *Hill*, 482 U.S. at 471, 107 S.Ct. 2502, 96 L.Ed.2d 398.

{¶ 26} But more importantly, *Smith* conflicts with the Ohio Supreme Court's more recent conclusion that the "fighting words" exception protects only the nonspeech element of the statement. *Thompson*, 95 Ohio St.3d 264, 2002-Ohio-2124, 767 N.E.2d 251. *Smith* involved the prosecution of the defendant for the mere utterance of questionable language, with the panel failing to disclose any protected nonspeech element. *See generally Smith*. Upholding the continued validity of *Smith* would place this district in conflict with the more narrow application of the "fighting words" exception that has developed in the last three decades and has been adopted by the Ohio Supreme Court in *Thompson*. In light of the continued confusion created by *Smith*, this court may be required to resolve the issue through our en banc procedures under App.R. 26, a process that can either be initiated sua sponte or through the parties' request under App.R. 26. *See, e.g., State v. Stansell,* 2021-Ohio-2036, 173 N.E.3d 1273, ¶ 11 (8th Dist.).

{¶ 27} In any event, while we must apply the law, we would be remiss to not recognize that police officers like Colon are often placed in unfair and difficult circumstances during the course of their daily duties. It is easy to articulate the

importance of First Amendment rights in the post hoc analysis, a deliberative process unavailable to officers reacting to unfolding situations on the street. Expecting an officer to have someone scream obscenities at them repeatedly speaks to the deterioration of respect in our society. There was a time when this crass behavior was the exception, but today we see it happening with greater frequency as individuals like Workman elevate their view of the First Amendment above common decency and respect.

{¶ 28} With respect to the conviction for "Playing Of Radios, Boom Boxes, Tape Cassettes, Disc Players Or Any Other Sound Devices Prohibited" in violation of W.C.O. 509.09(A), Workman claims that the conviction is a product of selective prosecution based on his speech, an issue Workman raised at trial through testimony, but not through a pretrial motion. According to Workman, and in reliance on *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 43, prosecutors may not selectively prosecute "'based upon such impermissible considerations as race, religion, *or the desire to prevent [the defendant's] exercise of constitutional rights*.'" *Id.* at ¶ 44, quoting *State v. Flynt*, 63 Ohio St.2d 132, 134, 407 N.E.2d 15 (1980). (Emphasis added.)

{¶ 29} A claim for selective prosecution "'is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution.'" *State v. Jones*, 2d Dist. Clark No. 2018-CA-94, 2019-Ohio-1548, ¶ 5, quoting *State v. Sanchez*, 9th Dist. Lorain No. 09CA009582, 2010-Ohio-4660, ¶ 33, and *State v. Getsy*, 84 Ohio St.3d 180,

203, 1998-Ohio-533, 702 N.E.2d 866. Generally, the defense must be raised in a pretrial proceeding under Crim.R. 12(C). *Id.*, citing *State v. Brown*, 6th Dist. Ottawa No. OT-95-040, 1996 WL 139626, *7 (Mar. 29, 1996), *Cleveland v. GSX Chem. Servs. of Ohio, Inc.*, 8th Dist. Cuyahoga No. 60512, 1992 Ohio App. LEXIS 2353, 5 (May 7, 1992). Under Crim.R. 12(H), the "'[f]ailure by the defendant to raise defenses or objections * * * shall constitute waiver of the defenses or objections, but the court for good cause shown may grant relief from the waiver.'" *Lakewood v. Calanni*, 8th Dist. Cuyahoga No. 95610, 2011-Ohio-3465, ¶ 10, quoting Crim.R. 12(H). Thus, the failure to timely object to a defect in an indictment waives all but plain error on appeal. *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, paragraph three of syllabus.

{¶ 30} According to Sgt. Colon's testimony, as relied upon by the village, no street musician has ever been arrested for playing music at the Eton Shopping Center because the owners permit certain individuals to do so. W.C.O. 509.09(A), however, is not dependent on the landowner's permission. That ordinance provides that "[n]o person shall play any * * * or musical instrument or any other type of sound device upon any public road, street, highway or private property in this City in a manner or at a volume as to disturb the quiet, comfort or repose of other persons."[2] Importantly, the village failed to produce any persons who claimed that

---

[2] The constitutional validity of what constitutes disturbing the quiet, comfort, or repose of other persons hinges on the interpretation of a statute as declared in *Chaplinsky*, 315 U.S. at 571, 62 S.Ct. 766, 86 L.Ed. 1031. *State v. Dorso*, 4 Ohio St.3d 60, 63, 446 N.E.2d 449 (1983). In *Dorso*, the Ohio Supreme Court determined that noise ordinances are not void for vagueness as long as they only "proscribe the transmission of

the music being played disturbed their quiet, comfort, or repose. *Akron v. Pouliot*, 9th Dist. Summit No. 25160, 2011-Ohio-2504, ¶ 46. But nevertheless, even if Eton Shopping Center permits buskers, they are all still subject to W.C.O. 509.09(A). Thus, Sgt. Colon concedes that busking is permitted at the shopping center such that others could be prosecuted but generally are not.

{¶ 31} In light of the fact that Workman's arrest and prosecution were solely dependent on his exercising rights guaranteed under the First Amendment and well within this court's discretion to recognize plain error under Crim.R. 52(B) and *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22-23, we conclude that Workman's conviction for a violation of W.C.O. 509.09(A) was impermissibly based on selective prosecution, an attempt to secure a conviction for any crime based solely on Workman's exercising his First Amendment rights. With no other crime that could have been charged, all that was left was a minor misdemeanor crime that rarely, if ever, sees the light of a courtroom. We cannot condone the village's wielding of perfunctory violations based on an attempt to curtail speech deemed unpalatable to the government actors. In light of the particular facts of this case, that slippery slope is far too steep.

{¶ 32} We reverse the decision of the trial court and vacate the convictions.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

---

sounds which disrupt the reasonable conduct of basic human activities, *e.g.*, conversation or sleep." *Id.* at 64.

It is ordered that a special mandate issue out of this court directing the municipal court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
SEAN C. GALLAGHER, ADMINISTRATIVE JUDGE

MARY J. BOYLE, P.J., CONCURS IN JUDGMENT ONLY, and
MARY EILEEN KILBANE, J., CONCURS IN JUDGMENT ONLY