[Cite as *Cleveland v. King*, 2025-Ohio-3067.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| CITY OF CLEVELAND, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 114464 |
| v. | : | |
| PARIS KING, | : | |
| Defendant-Appellant. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 28, 2025

Criminal Appeal from the Cleveland Municipal Court
Case No. 2023-CRB-005251

### *Appearances:*

Mark Griffin, Cleveland Director of Law, Aqueelah A. Jordan, Chief Prosecutor, and Thomas Fisher, Assistant Prosecutor, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Rick Ferrara, Assistant Public Defender, *for appellant.*

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Defendant-appellant Paris King appeals her convictions for disorderly conduct and resisting arrest. The crux of King's argument in this appeal is that "[t]he law cannot and does not prohibit non-violent protest against police

officers, even if it is loud." She maintains that "eighteen seconds of protest led to [her] unlawful arrest." While we agree with King that the First Amendment protects a person from speaking rudely, offensively, and insultingly to a police officer, it does not permit a person to disobey police orders or aggressively lunge towards an officer while yelling profanity in his face. In this appeal, King raises five assignments of error for our review:

> 1. King was denied due process of law through faulty jury instructions, which omitted an essential element of persistent disorderly conduct and forbade the jury from acquitting her of resisting arrest for lack of arrestable offense.

> 2. The trial court plainly erred in instructing and entering a conviction and sentence on persistent disorderly conduct and resisting arrest, as the jury verdict was based on faulty jury instructions supporting only a conviction of disorderly conduct, a lesser included offense.

> 3. Defense counsel provide[d] constitutionally ineffective assistance through faulty jury instructions.

> 4. Insufficient evidence supported King's conviction for disorderly conduct and resisting arrest.

> 5. The manifest weight of the evidence did not support King's convictions.

{¶ 2} After review, we conclude that reversible error did not occur with respect to the trial court's jury instructions. We do not agree with King that a manifest miscarriage of justice resulted because of the trial court's failure to (1) instruct the jury on the element of persistence, (2) permit the jury to consider that disorderly conduct may be a nonarrestable offense if the element of persistence is not proven, and (3) better explain King's free-speech rights. Therefore, King's first and second assignments of error have no merit. Because we do not find that a

manifest miscarriage of justice occurred, we also find no merit to King's third assignment of error arguing that her trial counsel was ineffective for failing to supply proper jury instructions to the trial court.

{¶ 3} Finally, we conclude that King's convictions for disorderly conduct and resisting arrest were not based on insufficient evidence and were not against the manifest weight of the evidence. Thus, we overrule King's fourth and fifth assignments of error as well and affirm the trial court's judgment.

## I. Procedural History and Facts

{¶ 4} In July 2023, King was charged with three counts: (1) criminal trespass in violation of Cleveland Cod.Ord. 623.04, a misdemeanor of the fourth degree; (2) persistent disorderly conduct in violation of R.C. 2917.11(A)(1), 2917.11(A)(2), and 2917.11(E)(3)(a), a misdemeanor of the fourth degree; and (3) resisting arrest in violation of R.C. 2921.33, a misdemeanor of the second degree.

{¶ 5} The City moved to consolidate King's case with the case of her codefendant and mother, Juanita Gowdy. The trial court granted the City's request and consolidated the cases.

### A. Jury Trial

{¶ 6} The case proceeded to a joint jury trial. The following facts were taken from the witnesses' testimonies, video recordings from the body cameras of four University Hospitals police officers, and the footage from two hospital surveillance cameras.

{¶ 7} The City presented three University Hospitals police officers who were working on the night of July 3, 2023: Officers Kayla Tomm and Jamal Gill and Corporal Andrew Huling. A fourth officer who was also present that evening, Officer Sedivy, did not testify. Although Officer Sedivy did not testify, King submitted the recording from his body camera into evidence, which the trial court admitted. The City also presented a nurse who was on duty in the emergency room that night and the detective assigned to the case.

**The City's Case**

{¶ 8} Officer Tomm stated that she and the other officers were dispatched to the emergency room at University Hospitals' main campus because two people with gunshot wounds were en route to the hospital. She explained that when the emergency room receives patients with gunshot wounds, it is hospital policy that the emergency room "go[es] into a soft lockdown." During a soft lockdown, police officers "stand outside the doors to make sure no one" except patients go inside the emergency room. Officer Tomm testified that by implementing a soft lockdown, the hospital and the officers hope to prevent someone from entering who might try "to finish the job."

{¶ 9} While the officers were standing near the entrance, a man approached them. He told the officers that he wanted to go inside because his son had been shot. The officers would not let him enter the hospital at that time due to the soft lockdown. Officer Tomm told the man that the hospital was "not letting visitors in at the moment." The man was very upset. An unknown woman approached the

officers, telling them, "That's his son."  Officer Tomm told the woman that even if they were to let the man inside, he could not see his son at that time because doctors were assessing his son's health.

{¶ 10} Gowdy, who was a patient in the emergency room but was outside with King, was standing nearby and overheard the officers tell the man that he could not go inside to see his son.  Gowdy began talking to people standing outside of the hospital.  Gowdy then began yelling that it was not fair for the officers to deny the man entry to the hospital.  Gowdy walked to the parking garage, but the officers could still hear her yelling.

{¶ 11} Gowdy left the parking garage and walked towards the officers.  She told them, "I am going to do something about this.  This is dead wrong what y'all are doing.  Dead wrong, y'all.  We ain't in 1963."  Officer Tomm told Gowdy, "Go get your stuff please."  Officer Gill stated to the other officers, "If she is not a patient, she cannot come back in."  King, who was still standing near the entrance to the parking garage, yelled to the officers, "Don't say nothing to my mother, please."  King continued to tell Officer Tomm to not talk to her mother.

{¶ 12} Gowdy approached the entrance to the emergency room where the officers were standing.  She stated, "Stuff like this shouldn't even happen.  I'm going in," and she grabbed the door handle.  Officer Gill told her, "No."  Gowdy replied that she was going to go "back in" to get her medical-test results.  Officer Gill told her that she could not go back inside and asked her if she was a patient.  Gowdy replied that she was.  At that time, King approached and told the officers, "You better

not touch my mama." King continued to tell the officers not to touch her mother. Officer Gill asked Gowdy to show him her hospital wristband. At first, Gowdy refused to show him her wristband. King was trying to get her mother to leave, but Gowdy was still trying to go inside. Gowdy showed her wristband to Officer Gill and told him, "I'm the councilwoman too." Officer Gill put his gloves on at that point and advised Gowdy that if she "kept going," she was going to be arrested for disorderly conduct. Gowdy kept telling Officer Gill to "open up the door" and let her get her results. Throughout this time, King was yelling at the officers and told them that they were all "disrespectful as f***."

{¶ 13} Corporal Huling stepped between Gowdy and Officer Gill and told Gowdy that before she could go inside, she needed to calm down. Gowdy replied that she was calm. She told him, "He said show me the badge. I showed you the badge." Gowdy continued to talk to Officer Gill. Corporal Huling told her that she needed to focus on him instead of Officer Gill. Gowdy asked Corporal Huling who he was. Corporal Huling told her that he worked there too and that he was a supervisor. Gowdy asked him for his name and badge number, which he gave to her. Gowdy told him that she was going to report all the officers because they were violating her rights. She also said that she was going to press charges against them. Corporal Huling told her that she could do what she likes but that she needed to calm down before she went back into the emergency room. Gowdy replied that she was "already calm." She then looked at Officer Gill and told him to "let [her] through, please." After several more things were said back and forth between

Corporal Huling and Gowdy, he told Officer Gill that Gowdy could go inside and get her results.

{¶ 14} Officer Gill opened the door for Gowdy. As Gowdy walked through the door, King began to follow her inside. Corporal Huling told King twice, "Ma'am, you gotta stay outside." After Corporal Huling put his arm up to block King and told her that she needed to stay outside, Gowdy grabbed King's left wrist and tried to pull her inside with her. Despite Corporal Huling's attempt to stop King, King continued to follow her mother inside the hospital. At that point, Officer Gill grabbed King's right arm to keep her outside. King immediately pulled her right arm away from Officer Gill in a very fast and aggressive motion, took a step toward him, and shouted in his face, "Do not touch me. Tell him do not touch me." Officer Tomm said that King "began to almost like lunge at an officer" and "pushed her chest out." Officer Gill testified that King "became very irate . . . [and] threatening" and "jumped all in [his] face and she took a lunging step" toward him.

{¶ 15} King continued to step closer to the officers, yelling in their faces that she would stay outside but that they did not have to touch her. Gowdy was also yelling at the officers. King repeatedly yelled in Officer Gill's face to not put his hands on her. Officer Gill told King that she was under arrest. Throughout this entire time, King was also shouting profanity at the officers.

{¶ 16} Officer Gill put his arm between King and her mother, and King yelled loudly in Officer Gill's face not to "put his mother f*cking hands" on her mother. At that point, Officer Gill attempted to put King's hands behind her back to handcuff

her. King pushed Officer Gill's arm away from her. Officer Gill stated that he was trying to push her face towards the glass of the emergency room so that he could put her hands behind her back. But King fought the officers and prevented them from putting handcuffs on her. Officers Tomm and Sedivy tried to help Officer Gill put handcuffs on King. The three officers tried to hold King against a railing, but she continued to fight them. Officer Tomm told King to let go of the railing. King cursed at her and tried to get away from the officers. In the process of doing so, King fell to the ground and knocked over a garbage can. King was kicking at the officers and trying to fight them. Officer Gill stated that King kicked him several times in his shins. Officer Tomm told King to stop resisting. The officers were able to get the handcuffs on King once she was on the ground. Corporal Huling remained by the door to the emergency room during the entire scuffle. Gowdy yelled at the crowd to take photos of the fight.

{¶ 17} The officers walked her to their booking room in the hospital. Officer Tomm said that while they were walking King to the booking room, Officer Sedivy was holding onto King's arm "in the escort position," and King began "flailing" and "thr[ew] her arm," which caused Officer Sedivy to fall into the railing. Officer Sedivy told King to "stop resisting" and eventually he "got her to calm down."

{¶ 18} When the officers were done booking King, they walked her to her vehicle. Gowdy eventually came to the car, and the officers removed King's handcuffs. King and Gowdy left.

{¶ 19} The officers agreed that they never told King or Gowdy that the hospital was in a soft lockdown. The officers stated that they were trained to implement a soft lockdown when there was a gunshot victim in the emergency room, but they agreed that there was no written policy regarding a soft lockdown.

**King's Case**

{¶ 20} Gowdy testified that she went to the hospital on July 3, 2023, because of swelling in her legs and feet. She asked her daughter to take her. When the gunshot victims arrived at the hospital, she and King had already been there for several hours. Gowdy said that King smokes, so she had gone in and out of the emergency room many times. Gowdy went outside with her one time, which happened to be just after the gunshot victims had arrived. When the police would not allow the father of one of the gunshot victims into the hospital, Gowdy said that it upset her. Gowdy admitted that she did not speak to the officers very nicely because she was angry.

{¶ 21} Gowdy stated that when she witnessed the officers attacking her daughter, she did not think her daughter would live. She believed that the police would kill King.

{¶ 22} Gowdy testified that she filed a report against the officers the following day. A week later, Gowdy learned that she had been charged with a crime.

{¶ 23} Gowdy said that she identified herself as an East Cleveland Councilmember "because a lot of people" knew who she was. She said that what the

police did to King got back to people who lived in East Cleveland. She stated, "That was part of my campaign smear of what ya'll did to my daughter."

{¶ 24} King testified that it was difficult for her to watch the videos of what occurred on July 3, 2023. She said that she "curse[d] like a sailor" and that it was "a bad part of [her] that a lot of people had to see."

{¶ 25} King stated that she got very upset when the officers touched her mother. King said that she did not believe anyone should touch anyone else. King explained that she had experienced abuse by an ex-husband in the past as well as by a police officer. When she tried to follow her mother inside the hospital and Officer Gill grabbed her wrist, she "really lost her temper." She said that she was "terrified," "scared," and "shocked." She explained that she moves a lot when she talks, so that is probably why they thought she lunged at them. She said it happened so fast that she did not have time to think.

{¶ 26} King testified that if the officers had just explained to her and her mother that it was the hospital's policy not to let anyone inside after a gunshot victim arrived, she would not have been upset. She said that she would have just remained outside and waited.

{¶ 27} At the close of all the evidence, King moved for a Crim.R. 29 acquittal, which the trial court denied.

**B. Jury Verdict and Sentence**

{¶ 28} The jury found King not guilty of criminal trespass but guilty of persistent disorderly conduct and resisting arrest.[1] The trial court sentenced King to one year of active community-control sanctions with counseling. It is from this judgment that King now appeals.

## II. Jury Instructions

{¶ 29} In her first assignment of error, King contends that she was denied due process of law because the trial court improperly instructed the jury. She argues that the jury instructions (1) omitted the element of persistence, which was an essential element of disorderly conduct, (2) did not allow the jury to consider disorderly conduct as a nonarrestable offense with respect to its instructions regarding resisting arrest, and (3) did not permit the jury to consider First Amendment exceptions to disorderly conduct.

**A. Structural Error**

{¶ 30} King did not object to the trial court's jury instructions. "Pursuant to Crim.R. 30(A), the failure to object to a jury instruction in a timely manner generally constitutes a waiver of any claimed error relative to the instructions unless the error amounts to plain error." *State v. Jallah*, 2015-Ohio-1950, ¶ 88 (8th Dist.). King contends, however, that the trial court committed structural error when it gave improper instructions to the jury. We disagree.

---

[1] The jury found Gowdy not guilty of both persistent disorderly conduct and obstruction of official business.

{¶ 31} First, King does not cite to any cases where a court held that improper jury instructions amounted to structural error. Moreover, after claiming that the trial court's improper jury instructions require an automatic reversal due to structural error, King does not provide any analysis or explain how or why structural error should apply here. It is not the job of this court to make the argument for her. *See* App.R. 12(A)(2).

{¶ 32} Notably, even the Ohio Supreme Court case that King cited in support of her argument that the trial court's jury instructions amounted to structural error, *State v. Wamsley*, 2008-Ohio-1195, does not support her claim. The Supreme Court held in *Wamsley* that the trial court's jury instructions omitting "the culpable mental state of the underlying offense of trespass" and "all the elements required to establish the underlying offense of assault" did not amount to structural error. *Id*. at ¶ 17-24.

{¶ 33} The Supreme Court explained in *Wamsley* that even serious constitutional errors — except in "'a "very limited class of cases"'" — do not amount to structural error that is subject to automatic reversal. *Id*. at ¶ 16, quoting *State v. Perry*, 2004-Ohio-297, ¶ 18, quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997). The Court listed some of the limited class of cases where structural errors have been found: (1) complete denial of counsel, (2) biased trial judge, (3) racial discrimination in selection of grand jury, (4) denial of self-representation at trial, (5) denial of public trial, and (6) defective reasonable doubt instruction. *Id*. at ¶ 18 (citing the United States Supreme Court cases that held such errors were structural).

{¶ 34} The Ohio Supreme Court further stated in *Wamsley* that although a defendant is generally "entitled to have the jury instructed on all elements that must be proved," the failure to do so "is not necessarily reversible as plain error" under Crim.R. 52(B). *Id.* at ¶ 17, citing *State v. Adams*, 62 Ohio St.2d 151 (1980), paragraph two of the syllabus. Rather, when a defendant fails to object to improper jury instructions, "the reviewing court must examine the record in order to determine whether that failure may have resulted in a manifest miscarriage of justice." *Adams* at paragraph three of the syllabus.

{¶ 35} Thus, we disagree with King that any error in the trial court's jury instructions amounted to structural error.

**B. Plain Error**

{¶ 36} King contends in her second assignment of error that if this court does not agree that the trial court's jury instructions amounted to structural error, we should still reverse her conviction under the plain-error standard.

{¶ 37} "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). There are three conditions that must be met to satisfy the plain error rule. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). First, there must be a deviation from a legal rule; i.e., an actual error. *Id.*, citing *State v. Hill*, 92 Ohio St.3d 191, 200 (2001). Second, the error must be plain, meaning that the error is an obvious defect in the trial proceedings. *Id.*, citing *State v. Sanders*, 92 Ohio St.3d 245, 257 (2001). Third, the

error must have affected the defendant's substantial rights. *Id.* This means that the trial court's error "must have affected the outcome of the trial." *Id.*

{¶ 38} As the Ohio Supreme Court pointed out in *Wamsley*, 2008-Ohio-1195, a reviewing court has the discretion in whether to take notice of and correct plain error. *Id.* at ¶ 27. The Supreme Court has "acknowledged the discretionary aspect of Crim.R. 52(B) by admonishing courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Barnes* at 27, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. Plain error should be noticed and corrected only "if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings'[.]" *Id.*, quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936).

{¶ 39} We will exercise our discretion to determine whether the trial court's jury instructions in this case amounted to plain error.

**Disorderly Conduct**

{¶ 40} King first argues that the trial court erred when it failed to instruct the jury on the aggravating element of persistence for disorderly conduct.

{¶ 41} King was charged with persistent disorderly conduct under R.C. 2917.11(A)(1) and (A)(2) as well as 2917.11(E)(3)(a). Disorderly conduct under R.C. 2917.11(A) provides in relevant part that

> [n]o person shall recklessly cause inconvenience, annoyance, or alarm to another by . . .
>
> (1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;

(2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person[.]

{¶ 42} While disorderly conduct is a minor misdemeanor, persistent disorderly conduct is a fourth-degree misdemeanor. R.C. 2917.11(E)(3)(a).

{¶ 43} According to the transcript, the trial court orally instructed the jury that before it could find King (and Gowdy) guilty of disorderly conduct, it must

> find beyond a reasonable doubt that on or about the 2nd day of July 2023, in the city of Cleveland, Ohio, the defendants Gowdy and/or King recklessly caused inconvenience, annoyance or alarm to another by doing any of the following: One, engaging in fighting and threatening harm to persons or property or in violent or turbulent behavior and/or made unreasonable noise or offensively course utterance, gesture or display or communicated unwarranted and grossly abusive language to any person.

{¶ 44} The trial court also defined recklessly, risk, cause, physical harm to persons and property, and turbulent behavior. The court then told the jury:

> In regard to defendant Gowdy, if you find that the City proved beyond a reasonable doubt all of the essential elements of the offense of disorderly conduct and/or obstructing official business, your verdict must be guilty. If your verdict is guilty, you will then separately decide beyond a reasonable doubt whether the defendant, Gowdy, persisted in the disorderly conduct after a reasonable warning or request to desist. If your verdict is not guilty, you will not consider this issue.

> In regard to defendant Gowdy, if you find that the City failed to prove beyond a reasonable doubt any one of the essential elements of the offenses of disorderly conduct and/or obstructing official business, then your verdict must be not guilty. In regard to defendant King, if you find that the City proved beyond a reasonable doubt all of the essential elements of the offense of criminal trespass and disorderly conduct, your verdict must be guilty. In regard to defendant King, if you find that the City failed to prove beyond a reasonable doubt any one of the essential elements of the offense[] disorderly conduct, then your verdict must be not guilty.

{¶ 45} After reviewing the transcript, we agree with King that the trial court failed to orally instruct the jury that it must find that King persisted in disorderly conduct after being told to stop.

{¶ 46} We cannot conclude, however, that the trial court's error in failing to instruct the jury on the element of persistence was so prejudicial that a manifest miscarriage of justice occurred. The jury heard the testimony of three of the four police officers who were present on the day of the incident. More significantly, the jury was presented with seven video recordings to review: the videos taken from the body cameras of all four officers who were present (two videos from one officer) as well as two surveillance videos from University Hospitals. The evidence established that King ignored police orders to not go inside the hospital, repeatedly yelled profanity in the officers' faces, and aggressively removed her arm from Officer Gill and stepped towards him when he tried to stop her from following her mother inside the hospital. Thus, members of the jury could decipher from the recordings exactly what occurred outside the emergency room on the night of July 23, 2023. Based on the evidence presented, the jury could have reasonably concluded that King persisted in disorderly conduct after the officers instructed her to stop.

{¶ 47} We further note that although the transcript indicates the trial court gave the written jury instructions to the jury to review and consider while deliberating, the written instructions are not in the record on appeal.[2] However, the

---

[2] King and Gowdy's proposed written jury instructions are in the record on appeal but not the instructions that the trial court gave to the jury.

jury's completed verdict form for disorderly conduct states, "We, the jury in this case, being duly impaneled and sworn, do find co-defendant **PARIS KING** guilty of **PERSISTENT DISORDERLY CONDUCT 2917.11(A)(1) & (A)(2)** as charged in the complaint." (Emphasis in original.) Thus, the jury considered the element of persistence and found King guilty of persistent disorderly conduct.

{¶ 48} Accordingly, we do not find that a manifest miscarriage of justice occurred when the trial court failed to include the essential element of persistence when orally instructing the jury.

**Resisting Arrest**

{¶ 49} Next, King contends that the trial court's jury instructions regarding resisting arrest were improper because the trial court told the jury, "You are instructed as a matter of law . . . disorderly conduct [is an] offense[] for which the defendant could be arrested." King maintains that telling the jury this was improper because it failed to allow the jury to consider that "disorderly conduct *was not* an arrestable offense" under R.C. 2935.26 and 2917.11(E)(2) and (3) if the jury did not find that she "persisted in disorderly conduct after reasonable warning or request to desist." (Emphasis in original.)

{¶ 50} Pursuant to R.C. 2935.26(A), a law enforcement officer may not generally arrest a person for the commission of a minor misdemeanor and instead must issue a citation. As we previously stated, disorderly conduct is a minor misdemeanor unless, as relevant to this case, "the offender persists in disorderly conduct after reasonable warning or request to desist." R.C. 2917.11(E)(3)(a). If

persistence is found, disorderly conduct is a fourth-degree misdemeanor and an arrestable offense. *Id.*; *Woodmere v. Workman*, 2022-Ohio-71, ¶ 9 (8th Dist.).

{¶ 51} Resisting arrest under R.C. 2921.33(A) provides that "[n]o person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another." Thus, lawful arrest is an essential element of the crime of resisting arrest. *State v. Mahalli*, 2016-Ohio-940, ¶ 17 (8th Dist.), citing *State v. Barker*, 128 Ohio App.3d 233, 240 (6th Dist. 1998). King argues that because the trial court failed to instruct the jury that it must find she persisted in disorderly conduct, she could only be found guilty of minor-misdemeanor disorderly conduct, which is not an arrestable offense. Without an arrestable offense, King asserts that there was not a lawful arrest. And without a lawful arrest, she argues that the jury could not find her guilty of resisting arrest. We disagree with King that there was not a lawful arrest in this case.

{¶ 52} To show a lawful arrest for purposes of resisting arrest under R.C. 2921.33(A), the City had to prove not only that there was a reasonable basis to believe an offense had been committed, but also that the offense was one for which the defendant could be lawfully arrested. *Id.*, citing *Columbus v. Lenear*, 16 Ohio App.3d 466, 468 (10th Dist. 1985). It was not necessary, however, for the City to prove that the defendant was in fact guilty of the offense for which the arrest was made to uphold a conviction for resisting arrest. *Id.*

{¶ 53} With respect to resisting arrest, the trial court instructed the jury:

Before you can find defendant King guilty, you must find beyond a reasonable doubt that on or about the 2nd of July 2023, in Cleveland, Ohio, Cuyahoga County, defendant King recklessly or by force resisted or interfered with a lawful arrest of herself or another.

{¶ 54} The trial court then defined recklessly, force, and resist or interfere.

Regarding lawful arrest, the trial court told the jury:

Arrest means an intent to arrest under real or pretended authority accompanied by actual, uh — actual constructive seizure or detention of the person and which is so understood by a person arrested.

You must also decide whether the arrest was lawful. The [City] must prove the arrest was in the process of taking place when the resistance or interference occurred. An arrest is lawful if the offense for which the arrest was being made was one for which the defendant could be arrested and the arresting officer had authority to make the arrest at the time and place where the alleged resistance or interference took place, and a reasonable police officer under the facts and circumstances in evidence would have believed that the following elements, uh, were being or had been committed by the defendant.

The City need not prove that the defendant was, in fact, or had been found guilty of the offense but only that the arresting officer had a reasonable belief of defendant's guilt. In determining whether the officers had reasonable cause to believe that the defendant had committed the offense of disorderly conduct or criminal trespass, you must put yourself in the position of the individual officers with their knowledge or their lack of knowledge and under the circumstances and conditions that surround them at the time. Must consider or conduct — you must consider the conduct of the persons involved and determine whether their acts and words and all the surrounding circumstances would have caused a person of ordinary prudence and care to believe that the defendant had committed either of the crimes of disorderly conduct . . . based upon the elements of which were summarized as part of the instructions.

Based on the facts in evidence, additional instructions must be given as to what constitutes an arrestable offense. You are instructed as a matter of law . . . disorderly conduct [is an] offense[] for which the defendant could be arrested.

{¶ 55} After review, we find no error on the part of the trial court, plain or otherwise. Persistent disorderly conduct is an arrestable offense. And based on the evidence presented at trial, the jurors could have determined that the University Hospitals police officers had a reasonable basis to believe that a criminal offense had been committed. Again, it was not necessary for the City to prove that King was in fact guilty of persistent disorderly conduct to uphold a conviction for resisting arrest.

{¶ 56} We further note that the police officers also arrested King for criminal trespass. King does not argue that criminal trespass was not an arrestable offense or that the officers did not have a reasonable basis to arrest her for criminal trespass. And it has no bearing on King's conviction for resisting arrest that the jury found King not guilty of criminal trespass. Thus, even if we agreed with King that disorderly conduct was not an arrestable offense in this case, criminal trespass was.

{¶ 57} We therefore find no merit to King's argument that the trial court's jury instructions regarding resisting arrest were improper.

**First Amendment**

{¶ 58} King further argues that the trial court's jury instructions on the First Amendment were incomplete and confusing. Regarding the First Amendment, the trial court instructed the jury:

> Whether defendant's speech was protected by First Amendment is a question of law of the Court. However, the point of free speech protections is to shield exactly the type of content that may in some individuals' estimation may be misguided or even hurtful. Toleration of insulting and even outrageous speech is necessary to the protection of free speech. Merely offens[ive] [or] belligerent speech that causes distress or embarrassment is not for that reason alone unprotected.

. . .

Accordingly, you may consider whether the content of the speech . . . acts by defendant had demonstrated an intent to communicate protected criticism directed at a government body, in this case the University Hospitals police officers. If you find the law enforcement officer was employed by University Hospitals . . . then you are instructed that as a matter of law an officer had authority to make the arrest.

{¶ 59} King asserts that the trial court "should have instructed the jury that *they* determine whether a First Amendment protection applied, and that they must determine whether to apply it." (Emphasis in original.) She further argues that the trial court failed to explain to the jury the standard for fighting words and maintains that she was "left utterly unprotected" by the trial court's instruction.

{¶ 60} King's arguments regarding free speech and fighting words apply only to disorderly conduct under R.C. 2917.11(A)(2). "A person may not be punished under R.C. 2917.11(A)(2) . . . unless the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace" — otherwise known as "fighting words." *State v. Hoffman*, 57 Ohio St.2d 129, 131-132 (1978). But here, the jury also found King guilty of disorderly conduct under R.C. 2917.11(A)(1). R.C. 2917.11(A)(1) "prohibits certain behavior" — not the content of speech. *State v. Reeder*, 18 Ohio St.3d 25, 26 (1985).

{¶ 61} Because the jury found King guilty of disorderly conduct under R.C. 2917.11(A)(1) and (A)(2), we cannot say that the outcome of her trial would have been different if the trial court's jury instructions regarding freedom of speech would have been more complete and less confusing. Thus, we find no merit to King's

argument that the trial court's jury instructions regarding freedom of speech violated her due-process rights.

{¶ 62} After considering and rejecting King's arguments regarding the trial court's jury instructions for disorderly conduct, resisting arrest, and freedom of speech, we overrule her first and second assignments of error.

## C. Ineffective Assistance of Counsel

{¶ 63} In her third assignment of error, King contends that her trial counsel failed to provide the trial court with sufficient jury instructions.

{¶ 64} To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984).

{¶ 65} We have already determined that any error in the trial court's jury instructions did not affect the outcome of the proceedings or result in a manifest miscarriage of justice under the plain-error analysis. As the Ohio Supreme Court stated in *State v. Rogers*, 2015-Ohio-2459, the plain-error standard under Crim.R. 52(B) is the same deferential standard that applies to the prejudice prong of claims of ineffective assistance of counsel. *Id*. at ¶ 22. Therefore, we cannot say that King was prejudiced by any deficiencies in her counsel's performance in failing

to provide the court with proper jury instructions. Accordingly, King's third assignment of error is overruled.

## III. Sufficiency and Manifest Weight

{¶ 66} In her fourth and fifth assignments of error, King argues that her convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

### A. Sufficiency of the Evidence

{¶ 67} King contends that the evidence presented at trial established that she was lawfully protesting the actions of the police officers and that her actions were not arrestable. She therefore asserts that the City's evidence was insufficient as a matter of law to convict her of disorderly conduct and resisting arrest.

{¶ 68} When considering a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997).

**Disorderly Conduct**

{¶ 69} King argues that while her conduct was "not necessarily laudable" and that she used profanity in an "extremely loud voice" to the police officers, she maintains that her words were not "fighting words." She therefore contends that the City's evidence was insufficient to convict her of disorderly conduct.

{¶ 70} The jury's verdict form indicates that it found King guilty of disorderly conduct under R.C. 2917.11(A)(1) and (A)(2). Again, even if we agreed with King that the City failed to prove beyond a reasonable doubt that she was guilty of R.C. 2917.11(A)(2) (disorderly conduct based on speech, i.e., fighting words), she was also convicted of disorderly conduct under R.C. 2917.11(A)(1). R.C. 2917.11(A)(1) "prohibits certain behavior," not the content of speech. *Reeder*, 18 Ohio St.3d at 26. "The word, 'turbulent,' in the context of [R.C. 2917.11(A)(1)], refers to tumultuous behavior or unruly conduct characterized by violent disturbance or commotion." *Id.* at 27. Thus, while "mere words are insufficient to support a conviction of disorderly conduct" under R.C. 2917.11(A)(1), "conduct showing 'a blatant disrespect for the law' has been held to rise to the level of violent or turbulent behavior." *Akron v. Concannon*, 2009-Ohio-4162, ¶ 17 (9th Dist.), quoting *State v. Stewart*, 1994 Ohio App. LEXIS 5716, *2 (11th Dist. Dec. 16, 1994).

{¶ 71} To establish that a defendant engaged in persistent disorderly conduct in violation of R.C. 2917.11(A)(1), the City had to establish that King (1) recklessly, (2) caused inconvenience, annoyance, or alarm to another, (3) by engaging in fighting, in threatening harm to persons or property, or in violent or

turbulent behavior, and (4) that she persisted in disorderly conduct after reasonable warning or request to desist. R.C. 2917.11(A)(1); R.C. 2917.11(E)(3)(a).

{¶ 72} King does not challenge the first three elements under R.C. 2917.11(A)(1). The only element that she claims was not supported by sufficient evidence is persistence under R.C. 2917.11(E)(3)(a). She maintains that the City failed to present sufficient evidence that she persisted in disorderly conduct. The crux of King's argument is that the officers' body cameras showed that she yelled at an officer for a mere 18 seconds before he arrested her. She maintains that 18 seconds is not sufficient to establish persistence. We disagree.

{¶ 73} To persist in disorderly conduct, the offender must be actively conducting him or herself in a disorderly manner, and after being warned or requested to desist, the offender continues the offensive behavior. *Warren v. Patrone*, 75 Ohio App.3d 595, 598 (11th Dist. 1991). There is no time requirement to establish persistence.

{¶ 74} In this case, Officer Gill and Corporal Huling both tried to tell King that she was not permitted to go back inside the emergency room with her mother. Corporal Huling told King several times, "Ma'am, you gotta stay outside." King, however, continued to walk towards the door to the hospital, defying the officer's orders. After Corporal Huling told King to stay outside multiple times, Gowdy grabbed King's left wrist to pull her inside the hospital. When Gowdy grabbed King's left wrist, King defied the officers' orders and began to walk inside the entryway to the emergency room. At that point, Officer Gill grabbed King's right arm to stop her

from going inside the hospital. King pulled her arm back from Officer Gill in an aggressive manner and stepped towards him, yelling in Officer's Gill's face, "Do not touch me."

{¶ 75} Corporal Huling attempted to separate King from Officer Gill, but she continued to fight Corporal Huling's attempts and was aggressively pushing against Corporal Huling to get to Officer Gill. While continuing to push towards Officer Gill, with her face practically up against his face, King continued to yell profanities at the officers. Officer Gill told King that she was under arrest, and King continued to fight them. Thus, reasonable factfinders could find that King's movements towards the officers were aggressive, turbulent, and persistent.

{¶ 76} Accordingly, we conclude that the City presented sufficient evidence to establish beyond a reasonable doubt that King persisted in disorderly conduct under R.C. 2917.11(A)(1).

**Resisting Arrest**

{¶ 77} King further argues that the City failed to present sufficient evidence that she resisted arrest. King maintains that because her arrest for disorderly conduct was not lawful, the City failed to present an essential element of resisting arrest, i.e., a lawful arrest.

{¶ 78} As we previously stated, the City only had to prove that the officers had a reasonable basis to believe that an offense of disorderly conduct had been committed and that the offense was one for which the defendant could be lawfully

arrested. *Mahalli*, 2016-Ohio-940, at ¶ 17, citing *Lenear*, 16 Ohio App.3d at 468. The City did that in this case.

{¶ 79} Accordingly, we conclude that the City presented sufficient evidence that King resisted arrest.

{¶ 80} King's fourth assignment of error is overruled.

**B. Manifest Weight of the Evidence**

{¶ 81} In her fifth assignment of error, King argues that her convictions for disorderly conduct and resisting arrest were against the manifest weight of the evidence.

{¶ 82} While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390. Weight of the evidence addresses the evidence's "*effect of inducing belief*." (Emphasis in original.) *Id*. at 386-387, quoting *Black's Law Dictionary* (6th Ed. 1990). When a defendant argues his or her conviction is against the manifest weight of the evidence, the court

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "'The discretionary power to grant a new trial should be exercised only in the exceptional

case in which the evidence weighs heavily against the conviction.'"  *Id.*, quoting *Martin* at 175.

{¶ 83} King claims that the jury lost its way in believing the false testimony of the officers.  She asserts that the officers' body cameras prove that Officer Gill "stepped forward to challenge King for being lawfully upset that Officer Gill touched her and her mother."  She further argues that the officers' body cameras carry "far greater weight than any" of the officers' testimonies.

{¶ 84} While we agree that the recordings taken from the officers' body cameras carry great weight, we disagree with King on what the videos establish.  We have independently reviewed all the footage from the officers' body cameras — which show multiple angles depending on where each officer was standing during the commotion — and agree with the jury's resolution of the facts.  Moreover, the three officers' testimonies were consistent with each other with respect to what occurred that evening, and their body cameras corroborated their testimonies.  We therefore disagree with King that the jury lost its way.

{¶ 85} King's fifth assignment of error is overruled.

{¶ 86} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the municipal court to carry this judgment into execution.  The defendant's conviction

having been affirmed, any bail pending is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

LISA B. FORBES, J., and
KATHLEEN ANN KEOUGH, J., CONCUR